[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-10020
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 9, 2010
JOHN LEY
CLERK

D.C. Docket No. 8:08-cv-00328-EAJ

MARCELLA POURMOGHANI-ESFAHANI,

Plaintiff - Appellee,

versus

DAVID GEE, Sheriff of Hillsborough County, individually,
SHANNA MARSH, Hillsborough County Deputy, individually,

Defendants - Appellants,

JOHN DOES, Numbers 1 through 7, individually, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 9, 2010)

Before EDMONDSON, HILL, and ALARCON,[*] Circuit Judges.

PER CURIAM:

In this section 1983 case, Plaintiff-Appellee Marcella Pourmoghani-Esfahani ("Plaintiff") alleges that Defendant-Appellant Deputy Shanna Marsh ("Defendant") applied excessive force to Plaintiff and was deliberately indifferent to her serious medical needs while Plaintiff was detained at the Hillsborough County Jail in Tampa, Florida, in November 2006.  On both constitutional claims, the district court denied Defendant's motion for summary judgment and qualified immunity; we affirm the decision on the excessive-force claim but reverse on the deliberate-indifference claim.

## I.  BACKGROUND

We review <u>de novo</u> the district court's denial of summary judgment, and we accept Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor.  See <u>Burnette v. Taylor</u>, 533 F.3d 1325, 1330 (11th Cir. 2008).

---

[*] Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth Circuit, sitting by designation.

The parties dispute what happened between check-in at the jail and a later physical struggle between Plaintiff and Defendant. The entire series of events was recorded--without sound--on several closed-circuit video cameras placed throughout the jail. Where the video obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account. See Scott v. Harris, 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). But the video is often not obviously contradictory because it fails to convey spoken words or tone and because it sometimes fails to provide an unobstructed view of the events. So, as we must while reviewing the district court's ruling on summary judgment, we have credited Plaintiff's version of the record evidence where no obviously contradictory video evidence is available.[1]

Early on a morning in November 2006, Tampa Police Department officers brought Plaintiff to the jail on outstanding warrants after a domestic-disturbance

---

[1] Plaintiff argues that Defendant has only raised issues of evidentiary sufficiency and that we have no jurisdiction to consider those matters on an interlocutory appeal. To the contrary, in denying Defendant's motion for summary judgment, the district court made a legal conclusion that, based on Plaintiff's version of the facts, Defendant violated federal law. We have jurisdiction to review legal conclusions bearing on questions of immunity.

call. After some disagreements between Plaintiff and Defendant during the initial minutes after Plaintiff's arrival, the confrontation escalated rapidly and resulted in a physical struggle between the two women on the waiting-room floor.

According to Plaintiff, while Plaintiff was seated in the jail waiting room, Defendant initiated physical contact by grabbing Plaintiff by the arm and trying to pull her up out of a waiting-room chair. Plaintiff clung to the chair's arm for support. Within seconds, Defendant succeeded in grabbing Plaintiff--including by the hair--and flipped her to the ground. In those first few seconds on the floor, Plaintiff reflexively clutched Defendant's legs and grabbed at the area near Defendant's utility belt. Then, while Plaintiff was on her knees, Defendant hit her three times on the back of the head with Defendant's hand. Within seconds, additional officers came to assist in subduing Plaintiff: a small group of officers leaned over Plaintiff, who by that time had been restrained face downward on the floor.

Then, while Plaintiff remained restrained on the floor, Plaintiff says that Defendant grabbed Plaintiff's head and slammed it to the floor seven to eight times, causing cuts and bruises on her face and leaving a pool of blood on the

4

floor.[2]  The group of officers then lifted Plaintiff to her feet and led her away, walking to a cell.

Plaintiff was placed into a cell with another female.  Plaintiff walked to the corner of the cell and slid down to a seated position on the floor.[3]  Within approximately two minutes of Plaintiff's arrival in the cell, a jail nurse entered the cell to check on Plaintiff.  After the nurse left, Defendant walked by Plaintiff's cell twice within the next approximately five minutes and observed her.

After Defendant left the cell area, Plaintiff's cellmate at intervals tried to get the guards' attention: she knocked on the cell's glass, waved her arm, and pointed to Plaintiff.  An officer responded within approximately four minutes; and within two minutes after that response, a nurse returned to check on and to provide medical care to Plaintiff.  A second nurse and another male officer arrived approximately two minutes later.  During this period, Defendant returned to the cell and oversaw events.  According to the jail incident report in the record, as a result of this second examination, the medical nurse determined that Plaintiff

---

[2] Defendant denies that the face slammings occurred.  The video does not establish whether the slammings occurred and does not establish whether a pool of blood was on the floor.

[3] Plaintiff says that she was unconscious and has no recollection of what transpired while she was in the cell; she offers no independent account of the facts during this time and looks to the videotape's account of the events.  So, we also look to the videotape evidence for the time when Plaintiff was in the jail cell.

appeared to be "having symptoms of a possible overdose and had an apparent seizure." From the time a nurse saw Plaintiff on the second occasion, Plaintiff received ongoing medical care for approximately fifteen minutes at the jail before being transported to the hospital for evaluation.

The hospital's medical records indicate that Plaintiff was found to have a controlled nosebleed, a contusion to the forehead, and face abrasions. Plaintiff's physical exam indicated that she suffered "no obvious discomfort." While there, Plaintiff underwent clinical testing: her CT scan showed no brain hemorrhage or skull fracture; but Plaintiff did test positive for marijuana and cocaine and had a blood-alcohol level of .141. As a result of the testing, Plaintiff received no stitches or other notable treatment--just Motrin--while she was at the hospital. At discharge, Plaintiff's medical records note that she had a pain score of 1 out of 10 and that her condition was "[i]mproved"; Plaintiff was released back to the jail fourteen hours later.[4]

Plaintiff later filed a complaint in the district court. The judge granted

---

[4] Plaintiff does not in her brief dispute the contents of the hospital medical records. But Plaintiff does additionally rely on a professional neuropsychological assessment performed seven-and-a-half months after the jail incident. The report states that Plaintiff "sustained injuries" as a result of the jail incident and that the jail incident "may have exacerbated" her neuropsychological difficulties. But the report also concluded that "poly-substance abuse, and history of seizure disorder of unknown [origin] may be the primary or contributing factors to her current deficits."

Defendant summary judgment on some of Plaintiff's claims but denied summary judgment and qualified immunity to Defendant on these two constitutional claims.

## II.  DISCUSSION

### A.    EXCESSIVE FORCE

We affirm the denial of qualified immunity on the excessive-force claim.

We stress that we do not decide today that Defendant, in reality, used unjustified or even unnecessary force.  On this record (even with the video), we cannot know.  But, for the sake of this appeal, we have taken the "facts" as Plaintiff asserts them.  If we take her "facts" as true, we then accept that the force that Defendant used was obviously--in the light of the preexisting law--beyond what the Constitution would allow under the circumstances.

### B.    DELIBERATE INDIFFERENCE

Deliberate indifference to a detainee's serious medical needs requires 1) an objectively serious medical need and 2) a defendant who acted with deliberate

7

indifference to that need.  See Burnette, 533 F.3d at 1330.  A "serious medical need" is "one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment."  Id.  For liability, the defendant must 1) have subjective knowledge of a risk of serious harm, 2) disregard that risk, and 3) display conduct beyond gross negligence.  Id.

Deliberate indifference may result not only from failure to provide medical care at all, but also from excessive delay: "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs."  McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).

On the facts of this case--even when accepting Plaintiff's version of the facts as true--it is not possible to conclude that Defendant acted with deliberate indifference to Plaintiff's medical needs.  On the question of medical needs, that Defendant disregarded a risk of serious harm to Plaintiff or displayed conduct beyond gross negligence is not borne out by this record.

To the contrary, Plaintiff received reasonably prompt medical attention.  Directly after their struggle, Defendant dispatched Plaintiff to her cell; a nurse saw Plaintiff within approximately two minutes of Plaintiff's arrival there.

After this initial evaluation by a nurse, Defendant was informed that

8

Plaintiff had a possible nose injury (but not that it was broken): this report gave Defendant no subjective notice of a medical emergency exceeding the capabilities of the jail nurses or that required a different course of action than the one Defendant actually took. Two minutes after the nurse's initial check, Defendant observed Plaintiff in her cell while Defendant completed paperwork posted on the exterior of Plaintiff's cell and on an adjacent cell. During this time, the video shows Plaintiff sitting on the cell floor apparently resting or asleep but not obviously in distress; Defendant was presented with no reason to perceive a serious medical need. Neither Plaintiff nor her cellmate sought Defendant's attention at that time.

When Plaintiff's cellmate later <u>did</u> signal for help, the response--again-- occurred promptly. A nurse and an officer attended to Plaintiff within approximately five minutes of the cellmate's <u>first</u> attempts to signal for help. Nothing indicates that Defendant ignored the cellmate's signals. And once someone did recognize the cellmate's signals for help, the jail nurse promptly returned; Plaintiff then received continuous medical care until she was taken to the hospital.

The medical treatment that Plaintiff received will support no conclusion of deliberate indifference by Defendant. The term "delay" hardly seems to fit the

9

facts at all; but to the extent that one could call the time involved in this case "delay," it was only a matter of minutes. Cf. Brown v. Hughes, 894 F.2d 1533, 1538-39 (11th Cir. 1990) (finding deliberate indifference where inmate with a broken foot was delayed treatment for a few hours); Aldridge v. Montgomery, 753 F.2d 970, 972-73 (11th Cir. 1985) (finding deliberate indifference where inmate had bleeding cut under his eye with treatment delayed for two and a half hours).

Plaintiff contends that Defendant should have immediately sent Plaintiff to the hospital after the alleged face slammings, that is, should have totally skipped over the jail nurses' care. But Plaintiff has pointed to no evidence in the record that Defendant possessed subjective knowledge of a medical need that required something more drastic than first being promptly checked by the jail's nurse. And when, during the second examination, a nurse suspected that Plaintiff had symptoms of a possible overdose and seizure, an ambulance arrived shortly thereafter to take Plaintiff to the hospital. Even if this information indicates that Plaintiff had a serious medical need--as Defendant concedes it does--it does not indicate that Defendant disregarded a risk of serious harm to Plaintiff or displayed conduct beyond (or conduct even approaching) gross negligence.

As a result, we must reverse the district court's decision and conclude that Defendant is entitled to summary judgment on the claim for deliberate indifference

to a serious medical need.

Even if a constitutional violation based on deliberate indifference was shown, Defendant is entitled to qualified immunity. Questions of deliberate indifference to medical needs based on claims of delay are complicated questions because the answer is tied to the combination of many facts; a change in even one fact from a precedent may be significant enough to make it debatable among objectively reasonable officers whether the precedent might not control in the circumstances later facing an officer. No preexisting law clearly established that an approximately two-to-five-minute delay of medical care--either while Plaintiff moved from the waiting room to her cell or then while the cellmate waited for a guard to respond to her signaling--is a constitutional violation, especially with facts like this case.[5]

Plaintiff acknowledges that no precedent supports her position but still contends that the law was, at the pertinent time, already clearly established because the violation was so obvious that every objectively reasonable officer in Defendant's position would have known that what Defendant did following the struggle was not enough. See generally Lee v. Ferraro, 284 F.3d 1188, 1198-99

---

[5] The district court referenced a delay of 12 minutes (the time between the nurse's first and second visits): under the preexisting law at the pertinent time, hardly a clear constitutional violation given all the circumstances.

(11th Cir. 2002) (sometimes constitutional violation is clear even without case law on point).  The constitutional violation of deliberate indifference was not obvious given the preexisting law, even if we are mistaken in concluding that the Constitution's prohibition of deliberate indifference was <u>not</u> violated at all.

## III.  CONCLUSION

The district court's order denying summary judgment and qualified immunity to Defendant on the excessive-force claim is AFFIRMED.  But we do not rule out today that Defendant might yet be due qualified immunity as the facts become developed.[6]  The district court's order denying summary judgment and qualified immunity to Defendant on the claim for deliberate indifference to serious medical needs is REVERSED.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

[6] For example, the district court may use special verdicts or written interrogatories to a jury to resolve disputed facts before finally ruling on qualified immunity.